## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MARCOS MARTINEZ and STEPHANIE MARTINEZ, on behalf of herself and her minor children, A.M.M., A.I.M., and E.A.M.,<br><br>Plaintiffs;<br><br>v.<br><br>HANCOCK COUNTY, MISSISSIPPI, MILTON ARIC LATSCHAR, in his individual capacity, ABE LONG, in his individual capacity, WILLIAM COVINGTON, in his individual capacity, JOHN DOE #1, in his individual capacity, JOHN DOE #2, in his individual capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIV. A. NO. __1:18-cv-354-HSO-JCG<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

## PRELIMINARY STATEMENT

1.      Plaintiffs, a Latino and Native American family living in South Carolina, were driving through Mississippi on their way to take vacation last year when they were unlawfully detained by Defendants for several hours and subjected to extensive interrogation, threats and multiple unlawful searches because of their perceived race, ethnicity and national origin.

2.      Marcos and Stephanie Martinez and their minor children, A.M.M., A.I.M., and E.A.M. (collectively, "Plaintiffs"), were unlawfully stopped by Defendant Milton Aric Latschar, a deputy with the Hancock County Sheriff's Office ("HCSO"), while driving through Hancock County, Mississippi on June 3, 2017. Upon stopping the Martinez family, Defendant Latschar immediately asked whether the occupants of the vehicle were U.S. citizens.  He then confiscated

1

the U.S. passports, lawful permanent residency cards, and valid immigration documents belonging to Plaintiffs and other occupants of their vehicle, threatened Marcos Martinez with the loss of his lawful permanent residency, made baseless accusations that the family was engaged in criminal activity, and conducted an invasive search of the family's belongings—all because he perceived the family to be Latino and of Mexican descent.

3.     For approximately two hours, Defendant Latschar detained Plaintiffs by the side of Interstate 10 while he interrogated them, threatened them, searched their belongings, and inspected their vehicle. Although no evidence of illegal activity was found, Defendant Latschar and other HCSO officers then transported Plaintiffs to the HCSO, where deputies detained them for approximately two more hours and again searched their vehicle.

4.     After witnessing her family members cry over the course of several hours, Stephanie Martinez called 9-1-1 from inside the HCSO and demanded her family's release. The family's lawyer also called the HCSO, challenged the legality of the family's detention and demanded their release. Only then did HCSO deputies release the Martinez family and return the passports, residency cards, and immigration documents that Defendant Latschar had confiscated.

5.     No evidence of illegal activity was ever found, and none of the Plaintiffs or the other occupants of their vehicle was charged with a crime or even given a traffic ticket. The HCSO deputies never had any reason to believe that the Plaintiffs or other occupants of their vehicle had done something illegal, or that the vehicle contained any evidence of criminal activity.

6.     Defendant Latschar's actions were based on a racist assumption that any Latino person must be either undocumented or a criminal or both. By interrogating Plaintiffs about their immigration status and confiscating the passports, residency cards, and immigration documents

2

of everyone in Plaintiffs' vehicle, Defendant Latschar attempted to act as an immigration agent, though he had no authority to do so. The HCSO has no agreement with the federal government giving the HCSO authority to enforce federal immigration law.

7.     Regardless, all occupants of the family's vehicle had lawful status: Marcos Martinez is a lawful permanent resident of the United States who was born in Mexico, and Stephanie Martinez and their three children are U.S. citizens. Other occupants of the vehicle, a friend and relatives of the Martinez family, were Mexican citizens who were lawfully in the United States on the day of the detention.

8.     Plaintiffs' experience is an example of pervasive racial profiling by law enforcement agencies throughout the United States.[1] Racial profiling—law enforcement action based on a person's race, ethnicity, national origin or color—is not only unlawful and traumatic to victims; it also threatens public safety by eroding communities' trust in law enforcement officers.[2]

9.     The HCSO does not have any written policy prohibiting racial profiling, despite guidance from the International Association of Chiefs of Police that "[t]he first step in preventing racial profiling is the development of a clear departmental policy banning the practice."[3]

10.     Plaintiffs—one of whom is a child with autism and an anxiety disorder—suffered significant emotional distress, among other injuries, as a result of the unlawful actions of

---

[1] S. POVERTY LAW CTR., RACIAL PROFILING IN LOUISIANA: UNCONSTITUTIONAL AND COUNTERPRODUCTIVE 5 & n.1 (2018), https://www.splcenter.org/sites/default/files/leg_special_report_racial_final.pdf (collecting studies from across the country showing large racial disparities in the rates at which motorists of color are stopped, searched, and arrested compared to white motorists).
[2] *Id*. at 7 & n.28, 8 & nn. 29-30.
[3] INT'L ASS'N OF CHIEFS OF POLICE, PROTECTING CIVIL RIGHTS: A LEADERSHIP GUIDE FOR STATE, LOCAL, AND TRIBAL LAW ENFORCEMENT 161 (Sept. 2006), https://www.theiacp.org/sites/default/files/all/p-r/Protecting_Civil_Rights.pdf.

Defendants. The family also lost trust in law enforcement officers following this harrowing incident.

11.     This action is brought pursuant to 42 U.S.C. § 1983 for the violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution. This action is also brought under the laws of the State of Mississippi, including the Mississippi Tort Claims Act, Miss. Code § 11-46-1 *et seq*., for the state torts of false arrest and false imprisonment.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, and to recover damages for the violation of those rights. The Court may exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(a).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## JURY DEMAND

14.     Plaintiffs demand a jury trial on all claims except the claims of false arrest and false imprisonment, for which they request a bench trial as required by the Mississippi Tort Claims Act. Miss. Code § 11-46-13(1).

## PARTIES

### Plaintiffs

15.     Plaintiff Stephanie Martinez is a resident of Taylors, South Carolina. She is married to Marcos Martinez and is the mother of A.M.M., A.I.M, and E.A.M., who also reside in

Taylors, South Carolina. Stephanie Martinez brings this action on her own behalf and on behalf of A.M.M., A.I.M., and E.A.M., who are minor children ages 9, 12, and 14, respectively. Stephanie Martinez is a United States citizen of Native American descent and A.M.M., A.I.M., and E.A.M. are United States citizens of Mexican and Native American descent.

16.     Plaintiff Marcos Martinez is a resident of Taylors, South Carolina. He is married to Stephanie Martinez and is the father of A.M.M., A.I.M., and E.A.M. He is a lawful permanent resident of the United States who was born in Mexico.

### Defendants

17.     Hancock County, Mississippi, is a political subdivision of the state of Mississippi. The Hancock County Sheriff's Office does not exist as a separate government entity apart from Hancock County.

18.     Milton Aric Latschar, sued in his individual capacity, is a deputy employed by the Hancock County Sheriff's Office in Hancock County, Mississippi. At all times relevant to this Complaint, Defendant Latschar was acting within the course and scope of his employment and under color of law. His actions, as set forth in this Complaint, were in reckless disregard of the safety and well-being of each of the Plaintiffs, who were not engaged in criminal activity at the time of any of the injuries alleged in this Complaint. Defendant Latschar is subject to the personal jurisdiction of this Court.

19.     Abe Long, sued in his individual capacity, is a deputy employed by the Hancock County Sheriff's Office in Hancock County, Mississippi. At all times relevant to this Complaint, Defendant Long was acting within the course and scope of his employment and under color of law. His actions, as set forth in this Complaint, were in reckless disregard of the safety and well-being of each of the Plaintiffs, who were not engaged in criminal activity at the time of any of

the injuries alleged in this Complaint.  Defendant Long is subject to the personal jurisdiction of this Court.

20.     William Covington, sued in his individual capacity, is a lieutenant employed by the Hancock County Sheriff's Office in Hancock County, Mississippi. At all times relevant to this Complaint, Defendant Covington was acting within the course and scope of his employment and under color of law. His actions, as set forth in this Complaint, were in reckless disregard of the safety and well-being of each of the Plaintiffs, who were not engaged in criminal activity at the time of any of the injuries alleged in this Complaint. Defendant Covington is subject to the personal jurisdiction of this Court.

21.     John Doe #1, sued in his individual capacity, is a deputy employed by the Hancock County Sheriff's Office in Hancock County, Mississippi. At all times relevant to this Complaint, Defendant Doe #1 was acting within the course and scope of his employment and under color of law. His actions, as set forth in this Complaint, were in reckless disregard of the safety and well-being of each of the Plaintiffs, who were not engaged in criminal activity at the time of any of the injuries alleged in this Complaint. Defendant Doe #1 is subject to the personal jurisdiction of this Court.

22.     John Doe #2, sued in his individual capacity, is a deputy employed by the Hancock County Sheriff's Office in Hancock County, Mississippi. At all times relevant to this Complaint, Defendant Doe #2 was acting within the course and scope of his employment and under color of law. His actions, as set forth in this Complaint, were in reckless disregard of the safety and well-being of each of the Plaintiffs, who were not engaged in criminal activity at the time of any of the injuries alleged in this Complaint. Defendant Doe #2 is subject to the personal jurisdiction of this Court.

6

## STATEMENT OF FACTS

### Detention and Search on Interstate 10

23.     On June 3, 2017, Marcos Martinez ("Mr. Martinez"), Stephanie Martinez ("Ms. Martinez"), A.M.M., A.I.M., and E.A.M. ("Martinez children") (collectively, "Plaintiffs" or "Martinez family") left their home in Taylors, South Carolina and began driving to Mexico, where they intended to take a vacation and drop off relatives who had been legally visiting the United States. The Martinez children had recently finished the school year in Taylors and were beginning their summer break.

24.     Mr. Martinez, a licensed South Carolina driver, was driving the family's van. The van bore a South Carolina license plate and an up-to-date registration sticker. Ms. Martinez was in the passenger seat. The other passengers in the van were the Martinez children; Mr. Martinez's mother, Maria Aguilar Nieto, then 83 years old; Mr. Martinez's sister, Gloria Martinez Aguilar; and a friend of the family, Ismael Guijon Rodriguez.

25.     Ms. Aguilar Nieto and Ms. Martinez Aguilar had been visiting the Martinez family in South Carolina on tourist visas, and one purpose of the trip to Mexico was to bring them home before the expiration of their visas. Mr. Guijon lives in South Carolina and he rode with the family to visit his relatives in Mexico.

26.      A.M.M., A.I.M., and E.A.M. are United States citizens of Mexican and Native American descent. They are and appear to be Latino. Ms. Martinez is a U.S. citizen with Cherokee ancestry. Ms. Martinez has been mistaken for being Latina because of her appearance and her association with Mr. Martinez and their children.

27.     Mr. Martinez is a lawful permanent resident of the United States and was born in Guanajuato, Mexico. He is and appears to be Latino.

28.     On the afternoon of June 3, 2017, the Martinez family was driving on Interstate 10 ("I-10") through Hancock County, Mississippi, heading west in the right lane of the two-lane highway. Mr. Martinez was driving the van.

29.     Defendant Latschar, wearing an officer uniform, was driving a marked police car belonging to the HCSO in the lane to the immediate left of the Martinez family. Defendant Latschar pulled up next to the Martinez family's vehicle and looked at the family's vehicle.

30.     Defendant Latschar immediately merged to the right lane behind the Martinez family's van and activated his lights, indicating that he wanted Mr. Martinez to stop the van.

31.     Mr. Martinez, complying with Defendant Latschar's signal, pulled over onto the right-hand shoulder of the highway and stopped. Defendant Latschar followed and parked behind Mr. Martinez.

32.     When the family was pulled over, then-10 year old A.I.M., who had been diagnosed with autism spectrum disorder and anxiety disorder, became frightened and began to cry and wail.

33.     At the moment he stopped the Martinez family's van, Defendant Latschar did not have reasonable suspicion to believe that any illegal activity had occurred or was about to occur in connection with the Martinez family's van or any occupant of the van.

34.     Police records claim that the Martinez family was stopped for careless driving. However, prior to being stopped by Defendant Latschar, Mr. Martinez had not violated Mississippi's careless driving statute. Miss. Code § 63-3-1213. He was driving carefully and in a prudent manner, with due regard for the width, grade, curves, corner, traffic and use of the streets and highways and all other attendant circumstances.

8

35.    Defendant Latschar's first statement to any occupant of the vehicle was not related to any traffic violation. Instead, Defendant Latschar's first inquiry was to ask whether everyone in the van was a United States citizen. Defendant Latschar was informed that Ms. Martinez and the Martinez children were United States citizens, that Mr. Martinez and the family friend, Mr. Guijon, were lawful permanent residents of the United States, and the two other women (Mr. Martinez's mother and his sister) were in the United States on valid tourist visas.

36.    Defendant Latschar demanded that Plaintiffs produce the immigration documents and/or passports of each of the van's occupants.

37.    Defendant Latschar took Ms. Martinez's passport, the Martinez children's passports, Mr. Martinez's residency card and driver's license, Mr. Guijon's residency card, and the tourist visas belonging to Mr. Martinez's mother and sister. Defendant Latschar returned to his vehicle.

38.    Defendant Latschar took photographs of the residency cards and immigration documents belonging to Mr. Martinez, Mr. Guijon, and Mr. Martinez's mother and sister, but did not return the documents to Plaintiffs. He also performed a computer check on the van's license plate number and on Mr. Martinez's license.

39.    Defendant Latschar's computer checks revealed that there were no violations, suspensions, or accidents associated with Mr. Martinez's license, and no legal violations associated with the Martinez family's vehicle. Defendant Latschar's computer checks and his review of the documents belonging to the vehicle's occupants did not identify any reason to believe that any unlawful activity had occurred or was about to occur in connection with the

9

vehicle or any occupant of the vehicle. Yet Defendant Latschar did not let Plaintiffs leave the roadside.

40.     There was no basis to suspect that any of the Plaintiffs or the other occupants of the van were not lawfully present in the United States; indeed, Defendant Latschar held in his hands documents that proved they were lawfully present.

41.     At the time Defendant Latschar stopped the Martinez family, the HCSO did not have any agreements with the federal government authorizing the HCSO to detain individuals based on suspicion that they are not lawfully present in the United States.

42.     Defendant Latschar asked Plaintiffs for passports and immigration documents solely because he perceived the occupants of the vehicle to be Latino and non-U.S. citizens.

43.     Upon information and belief, Defendant Latschar has not investigated the immigration status of Caucasians who were traveling along I-10 and who were similarly situated to Plaintiffs.

44.     Upon information and belief, Defendant Latschar has not stopped and detained Caucasian motorists, who were similarly situated to Plaintiffs, absent reasonable suspicion that illegal activity had occurred or was about to occur.

45.     By the time Defendant Latschar completed his computer checks, sufficient time had elapsed for him to determine whether to issue a traffic ticket to Mr. Martinez or any other occupant of the vehicle, and to issue any such ticket. Defendant Latschar never issued a ticket to Mr. Martinez or any other occupant of the Martinez family's vehicle.

46.     After completing the computer checks, and without having any reason to believe any illegal activity had occurred in connection with the van or its occupants, Defendant Latschar returned to the Martinez family's van.

10

47.     Defendant Latschar, who carried a gun on his person, directed Mr. Martinez to step out of the van. Mr. Martinez complied with the command. Defendant Latschar escorted Mr. Martinez to the back of the van, in front of the police car. Defendant Latschar still possessed the passports, residency card, and immigration documents belonging to Mr. Martinez and his family members. Mr. Martinez did not feel free to leave the scene, and a reasonable person would understand the situation to be a restraint on his freedom.

48.     Defendant Latschar asked Mr. Martinez where he was driving to, and Mr. Martinez explained that the family was going to Mexico. Defendant Latschar then asked whether all the bags in the van belonged to him, and Mr. Martinez said some things belonged to him but others belonged to other occupants of the van. Defendant Latschar then accused Mr. Martinez of smuggling drugs.  Mr. Martinez said he was not smuggling drugs and that there were no drugs in the van.

49.     Defendant Latschar threatened to take away Mr. Martinez's permanent residency card if he did not tell Defendant Latschar where he was hiding drugs. Defendant Latschar told Mr. Martinez that if he disclosed where the alleged drugs were hidden, Mr. Martinez would be able to maintain his lawful permanent residency. Mr. Martinez told Defendant Latschar that he did not have any drugs.

50.     Defendant Latschar told Mr. Martinez that he needed to search the van. Defendant Latschar then directed Mr. Martinez to get back inside the van. Defendant Latschar did not obtain the proper consent from Mr. Martinez to search the van or its contents.

51.     Defendant Latschar then approached the passenger-side window and directed Ms. Martinez to exit the van and stand on the side of the highway. Ms. Martinez complied with the

command and exited the van. Ms. Martinez did not feel free to leave the scene, and a reasonable person would understand the situation to be a restraint on her freedom.

52.     Defendant Latschar then told Ms. Martinez that he was looking for drugs and "illegals" and that his job involved catching people who were trafficking immigrants. Defendant Latschar asked Ms. Martinez if there were drugs in the van. Ms. Martinez said that the only drugs she had were medications prescribed by A.I.M.'s doctor to treat his autism spectrum disorder, anxiety disorder, and attention deficit hyperactivity disorder.  Ms. Martinez showed Defendant Latschar the bag containing the prescribed medicine.

53.     Defendant Latschar asked Ms. Martinez if he could search the back of the van. Ms. Martinez said yes. By this time, approximately 20 minutes, at least, had elapsed since Defendant Latschar's computer checks came back clean.

54.     Defendant Latschar never informed Ms. Martinez that she had the right to refuse consent to the search. Ms. Martinez believed she could not refuse consent to search the van. At this time, Defendant Latschar was still in possession of Mr. Martinez's residency card, the passports of Ms. Martinez and the Martinez children, and the immigration documents of the other occupants of the van. Federal law requires lawful permanent residents such as Mr. Martinez to carry their original residency cards with them at all times. 8 U.S.C. § 1304(e). Failure to do so is a crime.

55.     With Defendant Latschar in possession of these important documents, Plaintiffs were not free to leave the scene and Ms. Martinez did not feel free to refuse the search.

56.     When Defendant Latschar sought Ms. Martinez's consent to search the van, Plaintiffs were unlawfully detained. Defendant Latschar had no reasonable suspicion or probable

cause to believe that unlawful activity had occurred or would occur in the future in connection with any of the vehicle's occupants.

57.     After Defendant Latschar's computer checks came back clean, and certainly by the time he sought Ms. Martinez's consent to search the van, Plaintiffs' detention had become a de facto arrest.

58.     Defendant Latschar did not seek or obtain consent to search the van or its contents from any of the Martinez children, Mr. Guijon, or Mr. Martinez's mother or sister.

59.     There were several bags and suitcases in the trunk of the Martinez family's van, and Defendant Latschar opened and searched all or most of them. Defendant Latschar emptied the contents of those bags and suitcases and left the family's belongings, including many highly personal items, strewn all over the trunk of the van.  During his search, Defendant Latschar irreparably damaged a treasured painting which Mr. Martinez's mother had received as a gift.

60.     Defendant Latschar found no drugs or any evidence of illegality during his search of the van and its contents.

61.     Following his extensive search of the van and the Martinez family's belongings, Defendant Latschar returned to the driver-side window and directed Mr. Martinez to exit the van again.  Mr. Martinez again complied with this command and was escorted by Defendant Latschar to the back of the van, in front of Defendant Latschar's vehicle. Defendant Latschar again accused Mr. Martinez of smuggling drugs and asked Mr. Martinez where he was hiding drugs. Mr. Martinez again said he did not have any drugs. Defendant Latschar escorted Mr. Martinez back to the van.

62.     Defendant Latschar then knelt down and looked at the undercarriage of the van. At this point, the family had been detained by the side of I-10 for at least one hour.

13

63.     Defendant Latschar took photographs of parts of the undercarriage of the Martinez family's van.  Defendant Latschar then told Mr. Martinez that he thought someone had done shoddy work on the drive shaft of the vehicle, and that it appeared to be newer than the year of the van's manufacture. Defendant Latschar accused Mr. Martinez of hiding money and repeated that if Mr. Martinez cooperated, there would be fewer criminal penalties and he would not lose his residency.

64.     Defendant Latschar returned to the passenger-side window and directed Ms. Martinez to exit the van again. Defendant Latschar told Ms. Martinez that he believed the drive shaft had been modified by someone who was not a professional. Ms. Martinez said that her family had not modified the drive shaft, and that she had no knowledge of any such modifications.

65.     Defendant Latschar told Ms. Martinez that if she told him "the truth," she would not go to jail and she would not have to figure out what to do with her children.  Ms. Martinez began to cry after Defendant Latschar threatened to separate her from her children.

66.     A.I.M.'s cries continued and Ms. Martinez asked Defendant Latschar if they could leave, pointing out that A.I.M. was very upset. Defendant Latschar said that the family was not free to leave until they told him "the truth." Ms. Martinez told Defendant Latschar that she was telling him the truth. At this point, Defendant Latschar was still in possession of the passports, residency cards, and immigration documents belonging to the Plaintiffs and the van's other occupants.

67.     The drive shaft on the Martinez family's van had not been modified and did not appear to be modified. No reasonable officer, upon inspecting the underside of the Martinez family's vehicle, would believe that the drive shaft had been modified or tampered with. Indeed,

14

as set forth below, the HCSO itself later determined that the drive shaft had not been tampered with.

68.     Defendant Latschar detained the Martinez family on the side of I-10 for approximately two hours while holding their important personal documents and searching and inspecting the van. Throughout the course of this roadside stop and detention, on multiple occasions, Defendant Latschar threatened Mr. Martinez with revoking his permanent residency if he was not truthful or cooperative.

69.     Throughout the roadside detention, Plaintiffs believed that if they attempted to leave, Defendant Latschar would use force to continue detaining Plaintiffs.

70.     A.I.M. cried throughout most of the roadside detention. He remained inconsolable even after Ms. Martinez gave him an anti-anxiety medication which he had been prescribed by his doctor.

71.     Upon information and belief, Defendant Latschar subjected Plaintiffs to a lengthy detention, questioned them extensively, and searched their belongings because he perceived Plaintiffs to be Latino and of Mexican descent.

72.     Caucasian motorists whom Defendant Latschar stopped during this time period, and who were otherwise similarly situated to Plaintiffs, were not subject to detentions as lengthy and invasive as that to which Defendant Latschar subjected Plaintiffs.

73.     During the morning of June 3, 2017, Defendant Latschar stopped two Caucasian motorists, who were travelling on Interstate 10, for the same purported reason he stopped Mr. Martinez—careless driving. In each of those stops of Caucasian motorists, the stop lasted less than 15 minutes. These motorists were similarly situated to Plaintiffs.

15

74. After Defendant Latschar inspected the undercarriage of Plaintiffs' vehicle, Hancock County Sheriff's Deputy Abe Long, wearing an officer uniform, arrived to the roadside in a marked vehicle belonging to the HCSO.

75. Defendant Latschar asked Defendant Long to corroborate his claims about the van's drive shaft. Defendant Long knelt under the van and inspected the undercarriage.

76. Defendant Long, together with Defendant Latschar, detained Plaintiffs on the side of I-10 for at least 15 minutes following Defendant Long's arrival on the scene. Throughout the time he was present, Defendant Long could hear A.I.M. crying in the backseat of the Martinez family's van.

77. Although a drug detection dog was present in at least one of the HCSO vehicles, at no point during the roadside detention was the dog used to inspect the Martinez family's van.

78. Based on the words and actions of Defendants Latschar and Long, the Martinez family did not believe they were free to leave at any point during the roadside detention.

### Detention at the Hancock County Sheriff's Office

79. After Defendant Long arrived at the scene of the traffic stop of the Martinez family, Defendants Latschar and Long contacted Defendant William Covington, a lieutenant employed by the HCSO. Defendant Latschar sent photographs of the undercarriage of the Martinez family's van to Defendant Covington. Defendants Covington, Latschar, and Long decided that Defendants Latschar and Long should transport the Martinez family, the van's other occupants, and the van itself to the HCSO to conduct yet another search of the vehicle for evidence of criminal activity.

80. No warrant existed for a search of Plaintiffs' vehicle, and there was no probable cause to believe that the vehicle contained evidence related to illegal conduct. Plaintiffs were not

asked for their consent for another search of the vehicle, and no Plaintiff or other occupant of the vehicle consented to this search.

81.     Defendant Latschar told Mr. Martinez that he and the family were required to go with Defendants Latschar and Long to the HCSO. Defendant Latschar ordered Mr. Martinez to follow Defendant Latschar's vehicle. Defendant Latschar pulled his vehicle in front of the Martinez family's van and Defendant Long pulled his vehicle behind the van to ensure that the Martinez family would be forced to follow Defendant Latschar's car. Defendants Long and Latschar then escorted the Martinez family to the HCSO.

82.     Mr. Martinez drove the van behind Defendant Latschar to the HCSO under duress. During this time, Defendant Latschar maintained possession of Mr. Martinez's permanent residency card, Ms. Martinez's passport, the passports belonging to the Martinez children, and the immigration documents of the other occupants of the van. Defendant Latschar had also repeatedly threatened the Martinez family with severe legal consequences, including jail, separation of Ms. Martinez from her children, and stripping Mr. Martinez of his legal permanent residency. Mr. Martinez and Ms. Martinez reasonably believed that if they refused to follow Defendants Latschar and Long to the HCSO, these Defendants would have used force to require them to travel to the HCSO.

83.     At this point, and at all times during the events described in this Complaint, no warrant existed for the arrest of any of the Plaintiffs or any other occupant of the Martinez family's vehicle.

84.     At this point, and at all times during the events described in this Complaint, no reasonable suspicion or probable cause existed for the detention of any of the Plaintiffs or any other occupant of the Martinez family's vehicle.

17

85.     At this point, and at all times during the events described in this Complaint, no warrant or probable cause existed for the search of the Martinez family's vehicle.

86.     The drive to the HCSO lasted between 10 and 20 minutes. During this time, A.I.M. continued to cry.

87.     During the drive to the HCSO, Ms. Martinez contacted the family's immigration lawyer, Rachel Effron Sharma, to say that the family was being taken to the HCSO.

88.     Mr. Martinez drove behind Defendant Latschar's vehicle as Defendant Latschar entered the back of the HCSO building into an area surrounded by a fence. Defendant Latschar drove through a gate into the fenced-in area, and Mr. Martinez followed.

89.     After entering the fenced-in area, Defendant Latschar instructed Hancock County Sheriff's Deputy John Doe #1 to take all of the occupants of the van, except Mr. Martinez, to a room inside the HCSO building.

90.     Defendant Doe #1, who wore an officer uniform, escorted Ms. Martinez, the Martinez children, Mr. Martinez's mother and sister, and Mr. Guijon down a hallway. Defendant Doe #1 unlocked the door to a room and escorted them inside. Defendant Doe #1 told the Martinez family to stay in the room. Then Defendant Doe #1 left the room and locked the door.

91.     Ms. Martinez believed that if she refused to follow Defendant Doe #1 to the room, Defendant Doe #1 and other HCSO deputies would use force to continue detaining Plaintiffs.

92.     Ms. Martinez attempted to open the door through which they had entered and found it to be locked.

93.     While detained in the room, A.I.M. continued to cry and pace around the room and stated that he wanted to leave. Mr. Martinez's mother and E.A.M. also began to cry. Ms.

18

Martinez tried to comfort her family even though she was also worried about what would happen to them and to her husband.

94.     While the Martinez family was being detained at the HCSO, Ms. Effron Sharma called the HCSO and spoke to an official employed by the HCSO. Ms. Effron Sharma challenged the legality of the family's detention and demanded that they be released. The official said he had authorized the search of the family's vehicle. Ms. Effron Sharma asked what provided probable cause for the search, and the official did not answer her question. Upon information and belief, the official to whom Ms. Effron Sharma spoke was Defendant Covington.

95.     After being detained in the room for more than an hour, Ms. Martinez called 9-1-1. She informed 9-1-1 dispatch that she was in the Hancock County Sheriff's Office and she and her family were locked in a room and could not leave, and that they wanted to leave. Soon after Ms. Martinez called 9-1-1, Defendant Latschar unlocked the door to the room and informed Ms. Martinez that they were free to leave. Prior to that moment, none of the Plaintiffs had been told that they were free to leave.

96.     While Ms. Martinez and her children were being escorted to the room, Defendant Latschar directed Mr. Martinez to stay inside the family's van.

97.     Defendant Latschar told Mr. Martinez that if Mr. Martinez told him what Mr. Martinez had and where it was hidden, the consequences would be less severe for Mr. Martinez. Mr. Martinez replied again that he did not have anything illegal.

98.     Defendant Latschar directed Mr. Martinez to drive into an area that appeared be a garage. After parking the van inside the garage, Mr. Martinez was escorted by deputies to an area

19

some distance away from, but within view of, the van. Several uniformed officers stood near Mr. Martinez. A deputy employed by the HCSO arrived with a dog and inspected the van.

99.     Another deputy told Mr. Martinez that his van would be inspected again by putting it on a lift. Mr. Martinez was not asked for permission for this inspection. No Plaintiff was ever asked for consent to this search of the family's vehicle.

100.     Defendant Latschar then instructed Mr. Martinez to sit inside a HCSO vehicle. Mr. Martinez asked if he could retrieve his cell phone from his van, and Defendant Latschar refused to allow him to do so.  Mr. Martinez sat in the back of the HCSO vehicle while being guarded by Defendant Hancock County Sheriff's Deputy John Doe #2, who sat in the driver's seat. The doors to the vehicle were closed.

101.     While being detained in the back of the HCSO vehicle, Mr. Martinez asked to use the bathroom. After consulting with Defendant Latschar, Defendant Doe #2 opened the car door next to where Mr. Martinez was sitting and escorted him to a portable bathroom. Defendant Doe #2 waited outside the portable bathroom while Mr. Martinez used it. Defendant Doe #2 then escorted Mr. Martinez back inside the HCSO vehicle and shut the doors.

102.     Mr. Martinez believed that if he attempted to leave the HCSO, Defendant Doe #2 and the other officers would use force to continue detaining him. Mr. Martinez also believed that if he attempted to leave, he would be charged with a crime.

103.     At this point, Mr. Martinez could not have physically exited the HCSO on his own because he was surrounded by a locked gate and fence.

104.     Hancock County Sheriff's deputies placed the Martinez family's van on lifts, and a man in a uniform inspected the undercarriage of the van while Defendant Latschar shined a flashlight at the van's undercarriage.

105.    The HCSO concluded that the drive shaft on the Martinez family's van had not been tampered with.

106.    After the van was lowered back to the ground, Defendant Latschar approached the HCSO vehicle where Mr. Martinez was detained.  Defendant Latschar opened the vehicle door near Mr. Martinez and told him that he was free to leave.

107.    Prior to that moment, no one had told Mr. Martinez that he was free to leave.

108.    HCSO deputies opened the gates necessary to allow Mr. Martinez to drive his vehicle out of the fenced-in area, and pick up his family in a different area of the HCSO.

109.    Plaintiffs were detained at the HCSO for approximately two hours. Just before the Martinez family left the HCSO, Defendant Latschar gave Ms. Martinez back her passport, her children's passports, Mr. Martinez's residency card, the residency card belonging to Mr. Guijon, and the tourist visas belonging to Mr. Martinez's mother and sister. At no point before this time did any Defendant or anyone else offer to return these documents to the Martinez family.

110.    At no point during the events described in this Complaint was there reasonable suspicion or probable cause to believe that any of the Plaintiffs or any other occupant of the family's vehicle had engaged or was engaging in unlawful activity.

111.    None of the Plaintiffs was engaged in criminal activity at any time during the events described in this Complaint.

112.    Defendants acted in reckless disregard of the safety and well-being of Plaintiffs.

113.    Defendants' conduct involved reckless or callous indifference to Plaintiffs' federally protected rights, as outlined below.

## Plaintiffs Suffered Loss of Freedom and Emotional Distress

114.    As a direct, proximate result of the unlawful actions of Defendants, Plaintiffs suffered loss of freedom, significant emotional distress, and other injuries.

115.    Plaintiffs suffered loss of freedom as a result of being unlawfully detained by Defendants for a total of approximately four hours, including by the side of I-10, while driving to the HCSO, and at the HCSO.

116.    Plaintiffs suffered pain and suffering, emotional distress, humiliation, and mental anguish as a result of being unlawfully detained by Defendants, and as a result of the unlawful search of their vehicle by Defendant Latschar.

117.    Plaintiffs experienced distress and fear based on the threats of revocation of Mr. Martinez's legal residency and potential separation from his family, as well as threats by Defendant Latschar that Ms. Martinez would be separated from her children if she did not agree with his allegations that the family was engaged in criminal conduct.

118.    Following the June 3, 2017 incident, the entire family has become fearful and mistrustful of law enforcement. The Martinez children have experienced increased anxiety and fear when traveling. They have expressed fear that their father could be deported by law enforcement officers.

119.    Since June 3, 2017, Ms. Martinez worries frequently that her husband's permanent residency could be at risk as the result of another abuse of authority by law enforcement. Ms. Martinez has lost her peace of mind as well as her trust in law enforcement.

120.    All of the damages alleged in this Complaint are the result of the Defendants' unlawful actions.

## Notice of Claim Under the Mississippi Tort Claims Act

121.     Pursuant to the Mississippi Tort Claims Act, Plaintiffs have filed a notice of claim with Hancock County Chancery Clerk Timothy Kellar. Miss. Code § 11-46-11. The notice of claim was delivered to the Chancery Clerk by certified U.S. mail on May 22, 2018. No response has been received and more than 95 days have elapsed since the delivery of this notice of claim. Miss. Code § 11-46-11(3)(a)–(b).

## CLAIMS FOR RELIEF

122.     Each of the following counts relies upon all relevant portions of the foregoing allegations in this Complaint.

### Count I
### Fourth and Fourteenth Amendments to the U.S. Constitution—
### Unreasonable Seizure in Stopping Plaintiffs' Vehicle
### (42 U.S.C. § 1983)
### *On Behalf of All Plaintiffs Against Defendant Milton Aric Latschar*

123.     When Defendant Latschar activated his lights and pulled the Martinez family's van over to the side of I-10, he seized Plaintiffs within the meaning of the Fourth Amendment to the United States Constitution.

124.     At the moment Defendant Latschar stopped the Martinez family's van, he did not have objectively reasonable suspicion to believe that illegal activity had occurred or was about to occur, as set forth in paragraphs 23 through 45 of this Complaint. It was unreasonable to believe such suspicion existed.

125.     Defendant Latschar's actions in stopping Plaintiffs without reasonable suspicion violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

23

**Count II**
**Fourth and Fourteenth Amendments to the U.S. Constitution—**
**Unreasonable Seizure/False Arrest in Detaining Plaintiffs on Roadside**
**(42 U.S.C. § 1983)**
*On Behalf of All Plaintiffs Against Defendant Milton Aric Latschar*

126.    Defendant Latschar's continued detention of Plaintiffs on the side of I-10 for approximately two hours, described in paragraphs 30 through 80 above, constituted a seizure within the meaning of the Fourth Amendment to the United States Constitution.

127.    Defendant Latschar's actions and words during this roadside detention made clear to Plaintiffs that they were not free to leave the scene.

128.    At no point during this roadside detention did Defendant Latschar have objectively reasonable suspicion to believe that illegal activity had occurred or was about to occur, and it was unreasonable to believe such suspicion existed.

129.    At no point during this roadside detention did Defendant Latschar have probable cause to believe that a criminal offense had been or was being committed, and it was unreasonable to believe that such probable cause existed.

130.    Plaintiffs' detention on the side of I-10 was not reasonably related in scope to the circumstances that police records claim justified the stop in the first place. Most of this detention occurred after Defendant Latschar's computer checks came back clean and reflected no legal violations in connection with the Martinez family's vehicle or its occupants.

131.    The investigative methods employed by Defendant Latschar were not the least intrusive means reasonably available to verify or dispel any suspicions he had in a short period of time.

132.    When Defendant Latschar continued to detain Plaintiffs after the computer checks came back clean, Plaintiffs' detention became a de facto arrest.

24

133.     Defendant Latschar's detention of Plaintiffs by the side of I-10 without reasonable suspicion or probable cause violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## Count III
### Fourth and Fourteenth Amendments to the U.S. Constitution—
### Unreasonable Search
### (42 U.S.C. § 1983)
### *On Behalf of All Plaintiffs Against Defendant Milton Aric Latschar*

134.     Defendant Latschar searched the Martinez family's vehicle and luggage without voluntary consent and without probable cause to believe the vehicle or luggage contained any evidence of illegal conduct, as set forth in paragraphs 46 through 60 above. It was unreasonable to believe that such probable cause existed.

135.     Mr. Martinez did not consent to a search of the vehicle or the luggage in the trunk of the vehicle.

136.     At the moment that Defendant Latschar sought consent from Ms. Martinez to search the Martinez family's vehicle, Plaintiffs were unlawfully detained.

137.     Ms. Martinez's consent to search the vehicle was not voluntary, and it would have been unreasonable to believe that Ms. Martinez's consent was voluntary.

138.     Defendant Latschar's search of the luggage in the trunk of Plaintiffs' vehicle without probable cause or voluntary consent violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## Count IV
### Fourth and Fourteenth Amendments to the U.S. Constitution—
### Unreasonable Seizure/False Arrest in Detaining Plaintiffs on Roadside
### (42 U.S.C. § 1983)
### *On Behalf of All Plaintiffs Against Defendant Abe Long*

139.    Defendant Long's detention of Plaintiffs by the side of I-10, set forth in paragraphs 74 through 80 above, constituted a seizure within the meaning of the Fourth Amendment.  At this time, Plaintiffs' seizure was a de facto arrest.

140.    At no point during the approximately 15 minutes in which Defendant Long detained Plaintiffs by the side of I-10 did Defendant Long have objectively reasonable suspicion to believe that unlawful activity had occurred or was about to occur. It was unreasonable to believe such suspicion existed.

141.    At no point during Defendant Long's detention of Plaintiffs by the side of I-10 did he have probable cause to believe that a criminal offense had been or was being committed, and it was unreasonable to believe that such probable cause existed.

142.    Defendant Long's detention of Plaintiffs on the side of I-10 without reasonable suspicion or probable cause violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**Count V**
**Fourth and Fourteenth Amendments to the U.S. Constitution—**
**Unreasonable Seizure/False Arrest in Transporting Plaintiffs to the HCSO**
**and Detaining Plaintiffs There**
**(42 U.S.C. § 1983)**
*On Behalf of All Plaintiffs Against Defendants Milton Aric Latschar,*
*Abe Long, and William Covington*

143.    Plaintiffs' transportation to the HCSO and detention there for approximately two hours, set forth in paragraphs 79 through 109 above, constituted a seizure within the meaning of the Fourth Amendment.

144.    At the moment Plaintiffs were transported to the HCSO, and throughout the time they spent at the HCSO, Plaintiffs were under arrest.

26

145.    Defendants Latschar, Long and Covington caused the transportation of Plaintiffs and their vehicle to the HCSO, and caused the detention of Plaintiffs there for approximately two hours. Defendants Latschar and Long transported Plaintiffs to the HCSO, and Defendant Covington approved the transportation of Plaintiffs to the HCSO.

146.    At the moment that Defendants Latschar, Long, and Covington decided to transport Plaintiffs to the HCSO, none of these Defendants had objectively reasonable suspicion or probable cause to believe that an offense had been or was being committed, or any probable cause to believe the Martinez family's vehicle contained evidence of illegality. It was unreasonable to believe such reasonable suspicion or probable cause existed.

147.    At all times during Plaintiffs' detention en route to and at the HCSO, there was no objectively reasonable suspicion or probable cause to believe that an offense had been or was being committed, or any probable cause to believe the Martinez family's vehicle contained any evidence of illegality.  It was unreasonable to believe such reasonable suspicion or probable cause existed.

148.    No warrant was ever issued for the arrest of any of the Plaintiffs or other occupant of Plaintiffs' vehicle, and no warrant was ever issued for the search of Plaintiffs' vehicle.

149.    Defendants neither sought nor obtained consent from Plaintiffs to transport them and their vehicle to the HCSO, or to conduct a second search of their vehicle.

150.    The actions of Defendants Latschar, Long and Covington in causing the transportation of Plaintiffs to the HCSO and their detention at the HCSO violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**Count VI**
**Fourth and Fourteenth Amendments to the U.S. Constitution—**
**Unreasonable Seizure/False Arrest in Detaining Plaintiffs at the HCSO**
**(42 U.S.C. § 1983)**
*On Behalf of Plaintiffs Stephanie Martinez, A.M.M., A.I.M., and E.A.M.*
*Against Defendant John Doe #1*

151.    The detention of Plaintiffs Stephanie Martinez, A.M.M., A.I.M., and E.A.M. in a room in the HCSO, as set forth in paragraphs 89 through 95 above, constituted a seizure within the meaning of the Fourth Amendment. Plaintiffs' seizure constituted an arrest for which probable cause was required.

152.    Defendant Doe #1 caused the seizure and detention of Plaintiffs Stephanie Martinez, A.M.M., A.I.M., and E.A.M. in a room at the HCSO when he escorted Plaintiffs to the room and locked the door.

153.    Defendant Doe #1 did not have objectively reasonable suspicion or probable cause to believe that an offense had been or was being committed by any of these Plaintiffs, or probable cause to believe the Martinez family's vehicle contained evidence of illegality. It was not reasonable for Defendant Doe #1 to believe that reasonable suspicion or probable cause existed for Plaintiffs' detention.

154.    Defendant Doe #1's actions in causing Plaintiffs' detention at the HCSO violated Plaintiffs' clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**Count VII**
**Fourth and Fourteenth Amendments to the U.S. Constitution—**
**Unreasonable Seizure/False Arrest in Detaining Plaintiff at the HCSO**
**(42 U.S.C. § 1983)**
*On Behalf of Plaintiff Marcos Martinez Against Defendant John Doe #2*

28

155.     When Plaintiff Marcos Martinez was directed to sit in the backseat of a HCSO vehicle, and when he was guarded while in the vehicle and while using the bathroom, as set forth in paragraphs 100 through 107 above, Mr. Martinez was seized within the meaning of the Fourth Amendment. This seizure constituted an arrest for which probable cause was required.

156.     Defendant Doe #2 caused and participated in Mr. Martinez's seizure and detention by guarding him while he sat in the backseat of the HCSO vehicle and while he used the bathroom.

157.     Defendant Doe #2 did not have objectively reasonable suspicion or probable cause to believe that an offense had been or was being committed by Mr. Martinez, or probable cause to believe the Martinez family's vehicle contained evidence of illegality. It was not reasonable for Defendant Doe #2 to believe that reasonable suspicion or probable cause existed for Mr. Martinez's detention.

158.     Defendant Doe #2's actions in causing Mr. Martinez's seizure and detention at the HCSO violated Mr. Martinez's clearly-established rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### Count VIII
### Fourteenth Amendment to the U.S. Constitution—Equal Protection Clause
### (42 U.S.C. § 1983)
### *On Behalf of All Plaintiffs Against Defendant Milton Aric Latschar*

159.     As Latino persons of Mexican descent, Mr. Martinez, A.I.M., E.A.M., and A.M.M. are members of a protected class. Ms. Martinez, as a person of Native American descent, is also a member of a protected class. Defendant Latschar mistakenly believed that Ms. Martinez was Latina and of Mexican descent.

160.    As set forth in paragraphs 23 through 113, Defendant Latschar purposefully discriminated against Mr. Martinez, A.I.M., E.A.M., and A.M.M. based on their race, color, national origin, and ethnicity, and he purposefully discriminated against Ms. Martinez based on his perception of her race, color, national origin, and ethnicity and her association with Mr. Martinez and their children.

161.    As set forth in paragraphs 23 through 113, Defendant Latschar detained, questioned, and searched Plaintiffs because he perceived them to be Latino and of Mexican descent. During his extended detention of Plaintiffs, Defendant Latschar questioned Plaintiffs regarding their immigration status, demanded and confiscated documents reflecting their lawful presence in the United States, stated that he was looking for "illegals," and repeatedly threatened Mr. Martinez by telling him that he would lose his lawful permanent residency if he did not cooperate.

162.    Defendant Latschar did not subject Caucasian motorists, who were similarly situated to Plaintiffs, to detentions as lengthy or invasive as that to which he subjected Plaintiffs.

163.    By purposefully detaining, questioning, and searching Plaintiffs and subjecting them to different, burdensome and injurious treatment because of their actual or perceived race, color, national origin, and ethnicity, Defendant Latschar violated Plaintiffs' clearly-established rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**Count IX**
**False Imprisonment**
**(Mississippi Common Law and Mississippi Tort Claims Act)**
***On Behalf of All Plaintiffs Against Defendant Hancock County, Mississippi***

164.   Defendants Latschar, Long, Covington, Doe #1 and Doe #2 caused Plaintiffs to be falsely imprisoned, in violation of Mississippi common law, while these Defendants were acting in the course and scope of their employment by the HCSO.

165.   Hancock County, Mississippi is responsible for these actions of its employees under the Mississippi Tort Claims Act. Miss. Code §§ 11-46-1 *et seq.*

166.   Defendant Latschar falsely imprisoned Plaintiffs by detaining them on the roadside of I-10 for approximately two hours without reasonable suspicion or probable cause to believe that an offense had been or was being committed, as set forth in paragraphs 23 through 80 above.

167.   Defendant Latschar falsely imprisoned Plaintiffs by transporting them to the HCSO and causing them to be detained there for approximately two hours, without reasonable suspicion or probable cause to believe that an offense had been or was being committed, as set forth in paragraphs 79 through 113 above.

168.   Defendant Long falsely imprisoned Plaintiffs by detaining them on the roadside of I-10, transporting them to the HCSO, and causing them to be detained at the HCSO for approximately two hours, without reasonable suspicion or probable cause to believe that an offense had been or was being committed, as set forth in paragraphs 74 through 113 above.

169.   Defendant Covington falsely imprisoned Plaintiffs by deciding, together with Defendants Latschar and Long, to transport Plaintiffs to the HCSO and causing their continued detention there for approximately two hours, without probable cause to believe that an offense had been or was being committed, as set forth in paragraphs 79 through 113 above.

170.    Defendant Doe #1 falsely imprisoned Ms. Martinez, A.M.M., A.I.M., and E.A.M. by detaining them in a room in the HCSO, as set forth in paragraphs 89 through 95 above, without probable cause to believe that an offense had been or was being committed.

171.    Defendant Doe #2 falsely imprisoned Mr. Martinez by detaining him at the HCSO, as set forth in paragraphs 100 through 107 above, without probable cause to believe that an offense had been or was being committed.

172.    During each of the aforementioned detentions by Defendants Latschar, Long, Covington, Doe #1 and Doe #2, Plaintiffs were subject to reasonably apprehended force. Defendants' words and actions during Plaintiffs' detention made clear to Plaintiffs that they were not free to leave the scene.

173.    The actions of Defendants Latschar, Long, Covington, Doe #1 and Doe #2 in detaining Plaintiffs were objectively unreasonable in their nature, purpose, extent and duration.

174.    In falsely imprisoning Plaintiffs, Defendants Latschar, Long, Covington, Doe #1 and Doe #2 acted in reckless disregard of the safety and well-being of Plaintiffs, who were not engaged in criminal activity.

### Count X
### False Arrest
### (Mississippi Common Law and Mississippi Tort Claims Act)
### *On Behalf of All Plaintiffs Against Defendant Hancock County, Mississippi*

175.    Defendants Latschar, Long, Covington, Doe #1 and Doe #2 falsely arrested Plaintiffs, in violation of Mississippi common law, while these Defendants were acting in the course and scope of their employment by the HCSO.

176.    Hancock County, Mississippi is responsible for these actions of its employees under the Mississippi Tort Claims Act. Miss. Code §§ 11-46-1 *et seq*.

177.     Defendants Latschar, Long and Covington caused the false arrest of Plaintiffs by causing them to be transported to the HCSO and detained there for approximately two hours, without probable cause to believe that an offense had been or was being committed, as set forth in paragraphs 79 through 113 above.

178.     Defendant Doe #1 falsely arrested Plaintiffs A.M.M., A.I.M., E.A.M., and Ms. Martinez by detaining them in a room at the HCSO, as set forth in paragraphs 89 through 95 above, without probable cause to believe that an offense had been or was being committed.

179.     Defendant Doe #2 falsely arrested Mr. Martinez by detaining him at the HCSO, as set forth in paragraphs 100 through 107 above, without probable cause to believe that an offense had been or was being committed.

180.     In falsely arresting Plaintiffs, Defendants Latschar, Long, Covington, Doe #1 and Doe #2 acted in reckless disregard of the safety and well-being of Plaintiffs, who were not engaged in criminal activity.

## PRAYER FOR RELIEF

181.     Plaintiffs request the following relief:

    A.  Compensatory damages for pain and suffering, emotional distress, mental anguish and/or related emotional damages that Plaintiffs have incurred as a result of Defendants' unlawful conduct on June 3, 2017;

    B.  Compensatory damages for loss of freedom as a result of Defendants' unlawful conduct on June 3, 2017;

    C.  Nominal damages;

    D.  Punitive damages;

E.   Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C.

§ 1920 and as otherwise permitted by law; and

F.   Such other and further relief that the Court may deem just.


Dated: November 7, 2018                    By:    s/ Elissa Johnson
                                                  Elissa Johnson
Robert B. McDuff                                  Mississippi Bar No. 103852
Mississippi Bar No. 2532                          Southern Poverty Law Center
767 North Congress Street                         111 East Capitol Street, Suite 280
Jackson, Mississippi  39202                       Jackson, MS 39201
(601) 969-0802 (phone)                            (601) 948-8882 (phone)
(601) 969-0804 (fax)                              (601) 948-8885 (fax)
rbm@mcdufflaw.com                                 elissa.johnson@splcenter.org

Beth Orlansky
Mississippi Bar No. 3938
Mississippi Center for Justice
5 Old River Place, Suite 203
P.O. Box 1023
Jackson, MS 39215-1023
(601) 352-2269 (phone)
(601) 352-4769 (fax)
borlansky@mscenterforjustice.org